UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X
                                   :

METRO RISK MANGEMENT AGENCY,    :
                                   :

                Petitioner,   :               23-CV-1944 (VSB)
                                   :

     - against -         :
                                   :              **OPINION & ORDER**

                                   :

HUDSON SPECIALTY INSURANCE    :
COMPANY,                           :

               Respondent. :

--------------------------------------------------------X

Appearances:

Brian Philip Giunta
Gregory D. Speier
James Peter Duffy, IV
Reed Smith LLP
New York, NY

*Counsel for Petitioner*

Marc Laurance Abrams
Jennifer Leigh Zaluski
Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C.
New York, NY

*Counsel for Respondent*

VERNON S. BRODERICK, United States District Judge:

Before me are Metro Risk Management Agency's ("MRMA" or "Petitioner") Petition to Vacate an Arbitration Award,[1] (Doc. 15 ("Pet." or "Petition")), that was issued against it on February 10, 2023, (Doc. 17-12 ("Award")), and Respondent Hudson Specialty Insurance Company's ("Respondent" or "Hudson") Cross-Motion to confirm the final version of that same award, (Doc. 24). For the reasons that follow, Hudson's motion to confirm the arbitration award is GRANTED and MRMA's Petition to vacate is DENIED.

## I.     Factual Background

Petitioner MRMA is an insurance risk pool for three park departments in the greater Chicago area:  Schaumberg Park District ("SPD"); Palatine, and Mount Prospect. (Doc. 16 ("Pet. Mem.") at 4.)  Hudson is a reinsurance company that agreed, on December 19, 2017, to reinsure MRMA subject to specific terms and conditions laid out in a reinsurance agreement between Hudson and MRMA. The Reinsurance Agreement[2] provides for Hudson to reinsure MRMA for losses up to a policy limit of $10 Million, subject to the terms and conditions contained in the Reinsurance Agreement. (Doc. 17-3 at 5, Art. I, Ex. A.)

The Reinsurance Agreement also provides that "[a]ll unresolved differences of opinion between Reinsured and the Reinsurer relating to this Agreement, including its formation and validity, shall be submitted to arbitration before a panel consisting of one arbitrator chosen by the Reinsured, one arbitrator chosen by the Reinsurer, and a third arbitrator chosen by the first two arbitrators." (Doc. 17-3 Art. XXI. ("Arbitration Clause").)  The Arbitration Clause further provides that "[t]he arbitrators shall adopt their own rules and procedures and are relieved from

---

[1] The Petition seeks to vacate an "Interim Final Award". (Doc. 15 at 1.)

[2] "Reinsurance Agreement" refers to the Casualty Excess of Loss Reinsurance Agreement between MRMA and Hudson. (Doc. 17-3.)

judicial formalities.  In addition to considering the rules of law and the customs and practices of the insurance and reinsurance business, the arbitrators shall make their award with a view to effect the intent of this Agreement." (*Id.*)  The Arbitration Clause does not contain a choice of law provision identifying any specific jurisdiction's law pursuant to which the arbitration had to be conducted.  However, the Reinsurance Agreement does contain a choice of law clause providing that "[t]his Agreement is governed by and construed in accordance with the laws of Illinois, notwithstanding its choice or conflict of law rules to the contrary."  (*Id.* Art. XXVI.)  The Reinsurance Agreement also contains a clause entitled "Follow the Fortunes," which provides that the "Reinsured shall, at its sole discretion, adjust, investigate, settle, compromise, or defend all claims and Losses.  All Loss settlements or payments made by Reinsured will be binding upon the Reinsurer, provided such settlements or payments are within the terms of this Agreement and covered under the Reinsured coverage documents hereunder.  The true Intent of this Agreement being that the Reinsurer shall follow the underwriting fortunes of Reinsured in each case to which this Agreement applies."  (*Id.* Art XXVII(A).)  This clause also provides that "[w]hen so requested . . . the Reinsured shall afford the Reinsurer, at the Reinsurer's own expense, an opportunity to be associated with the Reinsured in the defense of any claim, suit, or proceeding involving this Agreement, and the Reinsured and the Reinsurer shall cooperate in every aspect in such defense."  (*Id.* Art. XXVII(B).)

MRMA invoked the Reinsurance Agreement in connection with an incident that occurred on July 8, 2017, when Collin Hogan ("Hogan") was injured at a "bubble ball" soccer party hosted by SPD.[3]  (Pet. Mem. 4.)  Hogan sued SPD in state court in Cook County, Illinois for

---

[3] "Bubble ball involves participants wearing plastic bubbles that cover their bodies while playing games such as soccer."  (Pet. Mem. 4 n.1.)

negligence and for willful and wonton conduct, seeking damages up to $85 million.  (*Id.* at 5–6.)

In February 2021, the court in Illinois permitted Hogan to amend his complaint to add claims,

after the suit had been "largely dormant for three years."  (*Id.*)  Shortly thereafter, SPD moved to

dismiss the negligence and spoliation claims, and the court set July 8, 2021, as a date for a ruling.

(*Id.*)  Prior to the ruling date, the parties scheduled a mediation for June 21, 2021.  (*Id.* at 6)

Before the mediation, SPD's defense counsel prepared a document entitled "CASE ANALYSIS,

SETTLEMENT AND TRIAL STRATEGY," ("Case Evaluation"), on May 27, 2021.  (*Id.*; Doc.

17-7.)  The Case Evaluation found that there was "no evidence of willful and wanton conduct on

the part of the SPD."  (Doc. 17-7 at 4.)  The Case Evaluation also concluded that "50% of the

time the jury would return a straight not guilty verdict for the park district."  (*Id.* at 5.)  The other

half of the time, "despite having opinions that the park did nothing wrong, a jury may still feel

compelled to award [Hogan] some money to compensate him for his catastrophic injuries.

Likely verdict potential could be in the range of $250,000 to 20 million dollars, excluding the

percentage of contributory fault attributable to [Hogan], which will reduce his award

accordingly."  (*Id.*)  Therefore, "a good settlement range," "would be between 1 million and 3

million dollars."  (*Id.*)  A representative of MRMA sent this analysis to a representative of

Hudson on May 28, 2021.  (Doc. 17-38.)

On June 10, 2021, the SPD board held an executive session to discuss the case.  At the

meeting, one of the SPD Executive Directors said that "our attorneys are fully prepared to go to

trial and think that we have, in all proper sense, a great case to win this outright of no fault."

(Doc. 17-8 at 1.)  However, "there's a chance we might have to pay $60, $90 million dollars if

we lose this case because of going to trial, and oh wait, there's an opportunity to potentially

settle in the $8-$10 million and that our policy covers $10 million without us being hurt

financially." (*Id.*)  When one commissioner at the meeting asked if Hudson was on board with such a settlement, the same Executive Director said that "[t]hey don't really have a choice." (*Id.* at 4.)  Ultimately, SPD decided to settle for up to policy limits, guided by analogy to unrelated "auto accidents," a case where a commissioner was on a jury, and a case where a commissioner was involved in an accident as a plaintiff.  (*Id.*)  On June 11, 2021, a representative of MRMA forwarded a representative of Hudson an email saying that "[t]he [SPD] Board met last night in executive session and unanimously voted to direct me to tell you to attempt to settle the Hogan case for an amount up to MRMA's policy limit." (Doc. 17-9.)  In response, the representative of Hudson said:  "Wow, this is surprising.  That's a lot of money for a claim we have always viewed as a strong one for liability defense.  Could either of you provide me with the Board's rationale for putting $10M on the table?" (*Id.*)  In response, the representative of MRMA said "Yes.  The $60 Mil[lion] number and their exposure above $10,000,000.  And it is in Cook County." (*Id.*)

On June 17, 2021, Hudson sent MRMA a letter saying that "[o]ffering the full policy limits in the face of defense counsel's evaluation of the case, the pending motion to dismiss . . . and the plaintiff's contributory negligence, does not appear reasonable, businesslike, or in good faith." (Doc. 17-11 at 4.)  Further, "[w]hile a robust settlement offer may ultimately be appropriate, merely offering the full policy limits just to end the case when that is not the recommended settlement posture is unfair to Hudson who will bare [sic] the cost of the settlement and a breach of MRMA's duties under the Agreement." (*Id.*)  On June 21, 2021, MRMA's representative responded that "[t]he lateness of the letter does not allow MRMA and Schaumburg Park District to make decisions about following through with the scheduled mediation this afternoon.  It does not allow MRMA and Schaumburg Park District the

opportunity to respond via their outside counsel.  It seems to me to be a solid basis for bad faith claims handling."  (*Id.* at 2.)

On June 21, 2021, the mediation occurred before Retired Judge William H. Gomolinski. (Doc. 17-13.)  It was clear at the mediation to the representatives of MRMA that "Hudson was unwilling to pay more than 3 to $4 mill[ion]."  (Doc. 17-2 at 864:21-865:13.)  The final offer made by MRMA during the mediation was $2.285 million.  (*Id.* at 864:7-11.)  During the mediation, the mediator also told MRMA representatives that "he did not think [Hogan] would take 10 million and that it would take more than that to settle."  (*Id.* at 865:14-866:7.)  However, he also told MRMA representatives that Hogan "might take the $10 mill[ion] so that door remains open" so MRMA representatives communicated via email to representatives from SPD that "that door remains open once we resolve issues with Hudson."  (*Id.* at 866:16-22.)  After the mediation on June 21, 2021, the mediator called MRMA's attorneys to tell them that "he's still working the case," and that Hogan was "willing to come down to 20 million if [MRMA was] willing to move up to 5 million," which MRMA communicated to Hudson.  (Doc. 17-13.) Hudson did not say what its position was on this possible resolution.  (*Id.*)

On July 8, 2021, the state court denied SPD's motion to dismiss.  (Pet. Mem. 7.)  On that same day, Hudson sent MRMA a letter explaining it was "not attempting to exercise any veto power over MRMA's settlement negotiations," but that "plaintiff has not made a policy limits demand and, in fact, is demanding a settlement well in excess of the policy limit," "defense counsel has not recommended that the case be settled for policy limit," and indicating that it did not intend to litigate "[a]s long as MRMA acts in good faith and consistent with the terms of the reinsurance agreement."  (Doc. 17-14 (cleaned up).)  Between July 8, 2021 and July 15, 2021, MRMA and Hudson exchanged emails regarding continued settlement negotiations.  On July 15,

attorneys for MRMA informed Hudson that "Plaintiff responded with a bracket of 7.5 to 12. Judge Gomolinski believes that plaintiff wants the midpoint, 9.75.  But he also believes he can get them to take 9.25.  I recommend we tell Gomolinski we will authorize settlement at 9.25 if absolutely necessary, but we want him to try to save as much off of that amount as he can. Maybe he can get them to 9.1 or 9.2."  (Doc. 17-15.)  Hudson responded that it was "still investigating internally."  (*Id.*)  On July 18, 2021, MRMA emailed Hudson, stating that "Hogan has settled at 9.2 mil[lion].  We are happy to be able to save $800,000 off the limit.  Need to work out payment early this week."  (Doc. 17-16.)

On July 26, 2021, MRMA emailed Hudson to say that it "did not receive a response to either the 7/15 nor the 7/18 emails regarding resolution of the claim."  (Doc. 17-17.)  MRMA then stated that it would "cut the check for $9.2 million and send you a copy of the check and the agreement for your file.  I request you ACH or Wire the funds within 48 hours of receipt.  Please reply with any issues with that plan.  Thanks."  (*Id.*)  Hudson responded that it "should be able to" accommodate that arrangement.  (*Id.*)

## II.    **Procedural History, Background of Arbitrators, and Award**

On October 4, 2021, Hudson initiated arbitration against MRMA.  (Doc. 17-2 at 951:10-12.)  Pursuant to the Reinsurance Agreement, the panel consisted of three arbitrators, one chosen by Hudson, one chosen by MRMA, and one chosen by the parties' selected arbitrators, which were "disinterested and [] active or retired officers of property or casualty insurance or reinsurance companies or retired judges with substantial experience in property or casualty insurance or reinsurance matters."  (Reinsurance Agreement Art. XXI.)  The arbitrators were: David Thirkill, who served as the Umpire; Jonathan Rosen; and Susan Claflin (collectively, the "Panel").  (Pet. Mem. 8.)  Jonathan Rosen, Hudson's arbitrator, was the "CEO, CFO, COO,

7

Counsel, and Chief Actuary for a major U.S. property and casualty company and has worked on approximately five hundred reinsurance arbitrations." (Doc. 20 ("Opp'n.") 5.) Susan Claflin, MRMA's arbitrator, was the "Senior Vice President and General Counsel for the second largest commercial insurer in the U.S." and had "served on hundreds of reinsurance arbitration panels." (*Id.*) Umpire David Thirkill "has over fifty years of experience in the insurance and reinsurance industry," and "has been appointed in well over 350 reinsurance arbitration matters." (*Id.* at 5–6.) On February 10, 2022, MRMA brought a pre-discovery motion for summary judgment. (Doc. 21-5.) On March 17, 2022 the Panel denied the motion over the objection of one arbitrator. (Doc. 21-6.)

Discovery was conducted and the Panel considered two rounds of pre-hearing briefing submissions. (Opp'n 1–2.) The briefing included "hundreds of pages of arguments, references to hundreds of legal authorities," and "well over two hundred exhibits." (*Id.* at 7.) The arbitration was held in Chicago from November 29 to December 2, 2022 and then in New York from January 30 to February 1, 2023, after the parties were not able to conclude the proceeding within one week. (Pet. Mem. 8.) MRMA put on four fact witnesses and Hudson put on three fact witnesses. (*Id.*) The parties did not call any expert witnesses to testify. (*Id.*) At the arbitration, MRMA argued that Hudson acted in bad faith by refusing to pay the Hogan settlement. (Opp'n 4.) MRMA alleged that Hudson had invoked its right of association, only to renege on those rights, and that it misled MRMA into believing it would cooperate with reinsuring the settlement payment. (*Id.* at 3.) In response, Hudson argued that MRMA had breached the Reinsurance Contract and acted in bad faith, therefore nullifying any obligation to reinsure MRMA. (*Id.* at 4–5.) This was because MRMA had abandoned valuable defenses to

the underlying claims and instead taken direction from SPD to settle for an unreasonable amount believing that Hudson "would be on the hook for the payment." (Opp'n 5.)

On February 10, 2023, the Panel unanimously issued an eleven-page interim final award and order. (Award.) The Award notes that "both Parties have claimed that the other acted in bad faith and have thus sought relief tailored to their respective positions, including an adverse award of costs, which both Parties have agreed is not precluded by the punitive damage prohibition set forth in the subject Arbitration Clause." (*Id.* at 2.) The Award also found that "in settling the Hogan claim, MRMA . . . prematurely subjugate[ed] the immunit[y defenses] in favor of a perceived deep pocket in Hudson to rid its insured of an otherwise highly defensible claim." (*Id.* at 3.) Further, "in effecting settlement of the Hogan claim in the manner it did at the time it did, MRMA committed bad faith through material breach and abrogation of its fundamental claims handling duties to Hudson under the" Reinsurance Agreement. (*Id.*) The Award found that although the May 28, 2021 Case Analysis recommended as a good settlement range, prior to the motion to dismiss ruling, between $1 and $3 million, (Doc. 17-7 at 5), MRMA breached the Reinsurance Agreement and acted in bad faith by "allow[ing] the SPD to take over and direct what became an outcome determinative process." (Award 4.) This is because "what really drove the Hogan settlement was the SPD's subjective and untethered fear of a nuclear verdict in the face of a misperceived 50/50 chance that the case could go either way." (*Id.* at 6 (cleaned up).) Therefore, "the absence of any meaningful division between the SPD and MRMA decision makers resulted in Hudson's reinsurance being improperly tapped as an involuntary bank." (*Id.*)

The Panel found that MRMA improperly withheld the rationale behind the SPD board's decision from Hudson, constituting bad faith and breaching the parties' agreement. (*Id.* at 3, 9.) "The Hogan claim was settled in principle in mid-July 2021," at which point "the horse was

9

already out of the barn" because "MRMA acted in complete dereliction of its duty of utmost good faith towards Hudson by failing to meaningfully protect the very essence of what was underwritten." (*Id.* at 8–9.) Nonetheless, "the record does not demonstrate that Hudson in any way acquiesced to the Hogan settlement or that, in its capacity as reinsurer, it did anything outside of the customarily accepted behavioral norms of a similarly situated reinsurer." (*Id.* at 8.) Therefore, because of MRMA's breach of contract and bad faith, Hudson was not required to pay the Hogan claim and was released from all legal obligations relating to the claim, was entitled to recoup its $1 million payment to MRMA sent as part of its reservation of rights, with interest compounding at 9 percent per annum if the amounts remained unpaid, and was entitled to attorneys' fees. (*Id.* at 9–10.) On March 8, 2023, the Panel issued its final award, which "reaffirms the Interim Final Award and incorporates it [] by reference." (Doc. 23-1.)

On March 23, 2023, MRMA filed its Petition to vacate the Award, (Doc. 15), accompanied by a memorandum of law, (Doc. 16), and a supporting declaration of Brian Giunta, which attached thirty-nine exhibits, (Doc. 17). On March 27, 2023, Hudson filed its response, (Doc. 20), accompanied by a supporting declaration from Marc L. Abrams, which attached sixteen exhibits, (Doc. 21). On March 27, 2023, Hudson filed a cross-motion to confirm the final arbitral award, (Doc. 24), accompanied by a memorandum of law, (Doc. 25 ("Resp. Mem.")), and a supporting declaration from Marc L. Abrams, which attached three exhibits, (Doc. 23). On April 17, 2023, MRMA filed a memorandum of law in response to Hudson's cross-petition that also served as a reply in support of its motion to vacate the Award, (Doc. 31 ("Pet. Reply").), accompanied by a supporting declaration of Brian Giunta, which attached three exhibits, (Doc. 30). On May 2, 2023, Hudson filed its reply in support of its cross-motion to

confirm the award, (Doc. 34), accompanied by a supporting declaration of Marc L. Abrams, which attached eight exhibits, (Doc. 35).

On October 17, 2024, without requesting leave from me, Petitioner filed a supplemental brief in support of its petition to vacate. (Doc. 41.)[4] On the same day, Respondent requested, and I granted, leave to file a response. (Docs. 42, 44.) Respondent filed its response on October 22, 2024. (Doc. 45.)[5] On October 24, 2024, Petitioner requested leave to file a further supplemental brief, (Doc. 46), which I denied, (Doc. 48).

### III.    **Legal Standard**

Under Section 10 of the Federal Arbitration Act ("FAA"), a district court may vacate an arbitration award on four grounds: (1) corruption or fraud, (2) "evident partiality or corruption in the arbitrators," (3) misconduct by the arbitrators, and (4) "where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made." 9 U.S.C. § 10(a). "Consistent with federal policy favoring arbitration, these vacatur provisions are to be accorded the narrowest of readings." *Beljakovic v. Melohn Properties, Inc.*, No. 04-CV-3694, 2012 WL 5429438, at *2 (S.D.N.Y. Nov. 7, 2012) (internal quotation marks omitted), *aff'd*, 542 F. App'x 72 (2d Cir. 2013) (summary order). The Second Circuit has found "as judicial gloss on these specific grounds for vacatur of arbitration awards," that a "court may set aside an arbitration award if it was rendered in manifest disregard of the law." *Schwartz v. Merrill Lynch & Co.*, 665 F.3d 444, 451 (2d Cir. 2011) (internal quotation marks omitted and alteration adopted) (collecting cases). In other words, "the showing

---

[4] "When neither the Court's Individual Rules nor the Local Civil Rules allow filing supplemental documents after a motion is fully briefed and filed, courts will generally not consider these supplemental papers." *AA Med. P.C. v. Almansoori*, No. 20-CV-03852, 2023 WL 4073772, at *2 (E.D.N.Y. June 19, 2023). Here, as in *Almansoori*, Petitioner "failed to request permission to file a sur-reply," therefore, "the supplemental filing [] should be stricken and not considered on the motion." *Id.* at *3.

[5] Since I am not considering Petitioner's supplemental brief, I will not consider Respondent's response.

required to avoid confirmation is very high." *D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 110 (2d Cir. 2006).

"Normally, confirmation of an arbitration is 'a summary proceeding that merely makes what is already a final arbitration award a judgment of the court.'" *D.H. Blair*, 462 F.3d at 110 (quoting *Florasynth, Inc. v. Pickholz*, 750 F.2d 171, 176 (2d Cir. 1984)). "A court may decide the merits of a petition to confirm or vacate an arbitration award 'based solely on the papers submitted by the parties in support of their motions.'" *Companion Prop. & Cas. Ins. Co. v. Allied Provident Ins., Inc.*, No. 13-CV-7865, 2014 WL 4804466, at *2 (S.D.N.Y. Sept. 26, 2014) (quoting *Productos Mercantiles E Industrials, S.A. v. Faberge USA*, 23 F.3d 41, 46 (2d Cir. 1994)). The party challenging an arbitration award must demonstrate "that the award falls within a very narrow set of circumstances delineated by statute and case law." *Leeward Constr. Co. v. Am. Univ. of Antigua-Coll. of Med.*, 826 F.3d 634, 638 (2d Cir. 2016) (quoting *Duferco Int'l Steel Trading v. T. Klaveness Shipping A/S*, 333 F.3d 383, 388 (2d Cir. 2003)); *accord Scandinavian Reinsurance Co. v. Saint Paul Fire & Marine Ins. Co.*, 668 F.3d 60, 71–72 (2d Cir. 2012) (observing that "[a] court's review of an arbitration award is . . . severely limited," and that a party "must clear a high hurdle" "in order to obtain vacatur" (internal quotation marks omitted)).

"The role of a district court in reviewing an arbitration award is 'narrowly limited' and 'arbitration panel determinations are generally accorded great deference under the [FAA].'" *Kolel Beth Yechiel Mechil of Tartikov, Inc. v. YLL Irrevocable Tr.*, 729 F.3d 99, 103 (2d Cir. 2013) (quoting *Tempo Shain Corp. v. Bertek, Inc.*, 120 F.3d 16, 19 (2d Cir. 1997)). "This deference promotes the 'twin goals of arbitration, namely settling disputes efficiently and avoiding long and expensive litigation.'" *Id.* (quoting *Telenor Mobile Commc'ns AS v. Storm*

12

*LLC*, 584 F.3d 396, 405 (2d Cir. 2009)). "Consequently, the burden of proof necessary to avoid confirmation of an arbitration award is very high, and a district court will enforce the award as long as 'there is a barely colorable justification for the outcome reached.'" *Id*. at 103–04 (quoting *Rich v. Spartis*, 516 F.3d 75, 81 (2d Cir. 2008)). Thus, even if the court is convinced that "the arbitrator committed serious error, the award should not be vacated so long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority." *Supreme Oil Co. v. Abondolo*, 568 F. Supp. 2d 401, 406 (S.D.N.Y. 2008) (internal quotation marks omitted and alteration adopted).

## IV.   **Discussion**

### A.   *The Panel Did Not Substantively Exceed Its Powers or Manifestly Disregard the Law*

An arbitral award may be set aside "where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made." 9 U.S.C. § 10(a)(4). The Supreme Court has held that this means that "an arbitral decision even arguably construing or applying the contract must stand, regardless of a court's view of its (de)merits." *Oxford Health Plans LLC v. Sutter*, 569 U.S. 564, 569, (2013) (internal quotation marks omitted). In addition, "as 'judicial gloss on the[se] specific grounds for vacatur of arbitration awards,' . . . [the Second Circuit has] held that the court may set aside an arbitration award if it was rendered in 'manifest disregard of the law.'" *Schwartz*, 665 F.3d at 451 (quoting *T. Co Metals, LLC v. Dempsey Pipe & Supply, Inc.*, 592 F.3d 329, 340 (2d Cir. 2010)). "To succeed in challenging an award under the manifest disregard standard, a party must make a showing that the arbitrators knew of the relevant legal principle, appreciated that this principle controlled the outcome of the disputed issue, and nonetheless willfully flouted the governing law by refusing to apply it." *Seneca Nation of Indians v. New York*, 988 F.3d 618,

13

626 (2d Cir. 2021) (internal quotation marks omitted).  In other words, manifest disregard is a "doctrine of last resort—its use is limited only to those exceedingly rare instances where some egregious impropriety on the part of the arbitrators is apparent."  *Duferco* , 333 F.3d at 389.

### 1.    The Panel Did Not Manifestly Disregard the Law Regarding the Right to Associate

First, Petitioner argues that the Panel manifestly disregarded the law regarding Hudson's right to associate and the consequential duties that invocation of this right entailed.  (Pet. Mem. 10–15.)  Petitioner claims that the Panel ignored the law requiring Hudson, after invoking its right to associate in defense of the Hogan claim, "to cooperate with MRMA."  (*Id.* at 12–13.)  Instead, MRMA claims, Hudson engaged in "abject breach" of its obligations by failing to cooperate with MRMA and withholding key information.  (*Id.* at 13.)  MRMA cites the *Peerless* case, in which the Fourth Circuit held a reinsurer liable for a settlement agreed to by the reinsured based on a duty to cooperate activated by the right to associate under specific circumstances.  *See Peerless Ins. Co. v. Inland Mut. Ins. Co.*, 251 F.2d 696, 704 (4th Cir. 1958) ("Our holding is that, under the facts of this case, where [reinsurer] knew as much about the [] case as did [reinsured] . . . and where [reinsurer] was freely and frankly consulted by [reinsured], and [reinsurer] left the decision in [reinsured's] hands, that decision became the decision of [reinsurer] as well as [reinsured].").  The "follow the fortunes" clause in *Peerless* was significantly broader than the clause signed by Hudson and MRMA, rendering the holding there distinguishable.[6]  More importantly, the court there explicitly predicated its holding on the full disclosure of all material facts to the reinsurer by the reinsured, and explained that it "express[ed]

---

[6] *Compare Peerless*, 251 F.2d at 704 ("[T]he liability of the Reinsurer shall follow that of the Company in every case"), *with* Doc. 12-3 Art. XXVII ("[T]he Reinsurer shall follow the underwriting fortunes of Reinsured in each case to which this Agreement applies.").

no opinion as to, what might have been the rights, obligations and liabilities of [the parties] inter sese if [reinsured] had held back from [reinsurer] any significant information." *Id.*

Therefore, *Peerless* is not analogous to the instant matter, where the Panel found that MRMA allowed its handling of the claim to be unduly influenced by "the half-baked paranoia of the SPD," (Award 9), and failed to disclose to Hudson a meeting with SPD on June 1, 2021, (*id.* at 5), and the various developments relating to the SPD and MRMA boards during the first two weeks of June, (*id.* at 5–7 ("All of the above was unknown to Hudson")).  Further, as the Respondent details in its opposition, the Panel had ample opportunity to, and did, consider the parties' arguments on the right of association, including Respondent's claims that the right of association was not so broad as Petitioner argued, that Respondent complied with its duty to cooperate with MRMA, that the right of association in the reinsurance context is more limited than in the primary insurance context, and that MRMA's bad faith conduct rendered any alleged failure to cooperate by Hudson nugatory.  (Opp'n 17–18.)  Consequently, it concluded that Hudson "promptly communicated with MRMA's risk manager," and that arguments relating to Hudson's conduct in the mid-to-late July time frame after the settlement in principle had been reached "are largely irrelevant because by that time the horse was already out of the barn." (Award 7–8.)

I cannot find that these conclusions were made in manifest disregard of the law.  "The relationship between a reinsurer and a reinsured is one of utmost good faith, requiring the reinsured to disclose to the reinsurer all facts that materially affect the risk of which it is aware and of which the reinsurer itself has no reason to be aware." *Christiania Gen. Ins. Corp. of New York v. Great Am. Ins. Co.*, 979 F.2d 268, 278 (2d Cir. 1992); *see also Unigard Sec. Ins. Co. v. N. River Ins. Co.*, 4 F.3d 1049, 1054 (2d Cir. 1993) ("This utmost good faith may be viewed as a

15

legal rule but also as a tradition honored by ceding insurers and reinsurers in their ongoing commercial relationships."), *abrogated on other grounds by Glob. Reinsurance Corp. of Am. v. Century Indem. Co.*, 22 F.4th 83 (2d Cir. 2021).  Therefore, "even under the 'follow the settlements' or 'follow the terms and conditions of the policy' clauses [], the reinsurer is liable only for a loss of 'the kind reinsured,'" i.e., claims paid in good faith and within the scope of the policy.  *City of Renton v. Lexington Ins. Co. (USA)*, No. CV-06-203, 2007 WL 2751356, at *6 (W.D. Wash. Sept. 19, 2007) (quoting *N. River Ins. Co. v. Cigna Reins. Co.*, 52 F.3d 1194, 1205 (3d Cir. 1995)); *see also Utica Mut. Ins. Co. v. Clearwater Ins. Co.*, 906 F.3d 12, 21 n.9 (2d Cir. 2018) ("A follow-the-settlements clause binds reinsurers to the insurer's decision of claim adjustment or settlement, so long as it is reasonable and made in good faith." (citing *N. River Ins. Co. v. ACE Am. Reins. Co.*, 361 F.3d 134, 139 (2d Cir. 2004))).

Here, the Panel made the explicit finding in the substantive and well-reasoned Award, based on hundreds of pages of submissions and more than a week of testimony, that "MRMA acted in complete dereliction of its duty of utmost good faith towards Hudson," by among other things, concealing material information from Hudson, treating Hudson "as an involuntary bank" and allowing SPD to exert "undue influence on MRMA's decision making objectivity."  (Award 6, 9.)  Therefore, the Panel did not ignore the law or disregard the follow the fortunes clause in the Reinsurance Agreement, but rather it held that it was inapposite, as it did not extend to cover the settlement reached by MRMA through bad faith conduct.  *See SI Commc'ns, Inc. v. Nielsen Media Rsch.*, 181 F. Supp. 2d 404, 409 (S.D.N.Y. 2002) ("In Illinois, every contract contains an implied covenant of good faith and fair dealing."); *Bellefonte Reinsurance Co. v. Aetna Cas. & Sur. Co.*, No. 85-CV-2706, 1989 WL 106469, at *3 (S.D.N.Y. Sept. 5, 1989) ("[T]he 'follow the

16

fortunes' provision is expressly subject to the other conditions in the policy."), *aff'd*, 903 F.2d 910 (2d Cir. 1990).

The Panel's application of the relevant law was sound and appropriate. For its part, Petitioner's grievance is not with how the Panel applied the law but rather with the way the Panel interpreted the contract, i.e., not to require Hudson to follow the fortunes of a settlement made in bad faith. The Second Circuit is not receptive "to invitations to second-guess an arbitrator's resolution of a contract dispute." *Andros Compania Maritima, S.A. v. Marc Rich & Co., A.G.*, 579 F.2d 691, 703 (2d Cir. 1978). In other words, "disputes over contractual interpretation do not rise to the level of manifest disregard of the law." *Landmark Ventures, Inc. v. InSightec, Ltd.*, 63 F. Supp. 3d 343, 356 (S.D.N.Y. 2014), *aff'd*, 619 F. App'x 37 (2d Cir. 2015) (summary order). "This is true because the manifest disregard standard is meant to protect against an arbitrator's willful disregard of clear law that is brought to the attention of the arbitrator. When an arbitrator is construing a contract, it could be said at most that the arbitrator is wrong, and courts are not to second guess arbitrators." *Id.* Because Petitioner's challenge to the Panel's interpretation of the right to associate effectively asks me to "second guess" the Panel's interpretation of the follow the fortunes clause, it does not, therefore, provide grounds for vacatur under the FAA.

### 2. The Panel Did Not Manifestly Disregard the Law Regarding the Duty of Utmost Good Faith

The Panel made two separate findings with regard to Hudson's compliance with the duty of utmost good faith. First, it found that Hudson did not do "anything outside of the customarily accepted behavioral norms of a similarly situated reinsurer." (Award 8.) Second, it found that Petitioner's allegations that Respondent violated the duty of utmost good faith were "largely irrelevant because by that time the horse was already out of the barn," (*id.*), since Petitioner had

17

already failed to comply with the duty of good faith. I cannot find that either of these findings manifestly disregarded the law related to the utmost good faith, nor that they exceeded the Panel's authority.

The Panel made no manifest mistake, i.e., it did not "kn[o]w of the relevant legal principle, appreciate[] that this principle controlled the outcome of the disputed issue, and nonetheless willfully flout[] the governing law," *Seneca Nation*, 988 F.3d at 626, with regard to its finding that that Hudson was relieved of any contractual breaches caused by MRMA's bad faith in allowing SPD to direct the negotiations process. In the first instance, such a question, concerning whether the bad faith conduct of MRMA could excuse the nonperformance of Hudson under the Reinsurance Agreement, is a disagreement with the Panel's interpretation of the Reinsurance Agreement that is outside of the scope of my review of the Panel's decision under the FAA. *Andros Compania Maritima*, 579 F.2d at 704 ("[W]hatever arbitrators' mistakes of law may be corrected, simple misinterpretations of contracts do not appear to be one of them.") (internal quotation marks omitted).

Moreover, under Illinois Law, "[w]here a party acts with improper motive . . . that party is exercising contractual discretion in a manner inconsistent with the reasonable expectations of the parties and therefore is acting in bad faith." *Peterson v. H & R Block Tax Services, Inc.*, 971 F. Supp. 1204, 1211 (N.D. Ill. 1997) (quoting *Dayan v. McDonald's Corporation*, 466 N.E.2d 958, 972 (Ill. App. Ct. 1984)). "If a party is found to have acted in bad faith, then the other party is relieved of the effects of contractual breaches caused by that bad faith." *Day Spring Enters., Inc. v. LMC Int'l, Inc.*, No. 98-CV-0658, 2004 WL 2191568, at *28 (W.D.N.Y. Sept. 24, 2004) (internal quotation marks omitted) (applying Illinois law); *see also Blue Axis Glob. Ltd. v. Alopex Advisors, LLC*, No. 24-MC-508, 2025 WL 343500, at *1 (S.D.N.Y. Jan. 30, 2025)

18

(defendant's "nonperformance would be excused" if plaintiff "negotiated [] in bad faith, withheld documents, withheld cooperation, unduly delayed its [] performance, and/or failed to provide [defendant] with the requisite information or aid necessary." (alterations adopted)). Therefore, any argument made by the Petitioner that the Panel incorrectly relieved Hudson of its duty of good faith relating to its conduct after the settlement in principle was entered in late July of 2021 is not supported by the facts and the law.

Furthermore, this legal analysis is ultimately gratuitous, because the Panel interpreted the contract and facts and concluded that Hudson did not, in fact, act in bad faith. (*See* Award 8 ("[T]he record does not demonstrate that Hudson in any way acquiesced to the Hogan settlement or that, in its capacity as reinsurer, it did anything outside of the customarily accepted behavioral norms of a similarly situated reinsurer.").) Whether such a fact-based determination was correctly decided is beyond the scope of my review concerning whether the Panel manifestly disregarded the law. *See Westerbeke Corp. v. Daihatsu Motor Co.*, 304 F.3d 200, 214 (2d Cir. 2002) ("The arbitrator's factual findings and contractual interpretation are not subject to judicial challenge, particularly on our limited review of whether the arbitrator manifestly disregarded the law."); *Malato v. Digitalocean*, No. 25-CV-2319, 2026 WL 686004, at *10 (S.D.N.Y. Mar. 11, 2026) ("[T]he manifest disregard standard does not extend to the parties' disputes over the evidence").

MRMA asks me to reach deep into the details of the Panel's fact-based determination to effectively relitigate the case and revisit the factual findings made by the Panel. However, conducting such a searching inquiry would be beyond the bounds of the "highly deferential" review that the governing law authorizes. *Duferco*, 333 F.3d at 389 ("Since 1960 we have vacated some part or all of an arbitral award for manifest disregard in the [] four out of at least 48

19

cases where we applied the standard" (collecting cases)); *see also GEM Yield Bahamas Ltd. v. Mullen Techs., Inc.*, No. 24-CV-1120, 2024 WL 2959259, at \*5 (S.D.N.Y. June 11, 2024) ("An award should be enforced 'despite a court's disagreement with it on the merits, if there is a *barely colorable justification* for the outcome reached.'" (citing *T. Co Metals LLC*, 592 F.3d at 339) (emphasis in original)). Therefore, I find that the Panel's decision regarding the duty of utmost good faith was well within the bounds of their authority and did not manifestly disregard the law.

### 3. The Panel Did Not Manifestly Disregard the Law Regarding the Duty to Settle

My analysis above, *see supra* § IV.A.2, applies with equal force to Petitioner's argument that the Panel incorrectly applied Illinois insurance law regarding the duty to settle. (*See* Pet. Mem. 18-23.) Again, Petitioner effectively seeks to relitigate a contract dispute decided adversely to it by the Panel, the finder of fact and authority on issues of contractual interpretation with regard to the parties' dispute. The Second Circuit has made clear that "vacatur for manifest disregard of a commercial contract is appropriate only if the arbitral award contradicts an express and unambiguous term of the contract or if the award so far departs from the terms of the agreement that it is not even arguably derived from the contract." *Westerbeke*, 304 F.3d at 222. Petitioner points to no such express departure here. Instead, Petitioner argues that it had a duty to settle the Hogan claim because "a claim has been made against the insured and there is a reasonable probability of recovery in excess of policy limits," (Pet. Mem. 18), which it argues gave rise to a duty to settle under Illinois law that the Panel manifestly disregarded, (*see id.* (citing *Haddick v. Valor Ins.*, 763 N.E.2d 299, 304–05 (Ill. 2001)).

The problem for Petitioner is that Respondent contested both of these fact-based predicates and the Arbitrator expressly agreed with the Respondent. (*See* Opp'n 22–25 (issue of

the duty to settle "was bitterly disputed"); Award 7 (describing "the SPD's subjective and untethered fear of a nuclear verdict" and finding that "Hogan never made a demand within limits").) Therefore, Petitioner is wrong to argue that "the undisputed evidence was that there was a reasonable probability of a finding of liability and a reasonable probability of an excess judgment against SPD." (Pet. Mem. 19.) Some of the evidence that Petitioner argues supports this proposition simply does not support the arguments put forth by Petitioner. For example, Petitioner cites testimony from Hudson's Director of Claims, David Schwier, (Doc. 17-24 at 1264:14-1267:12), but Mr. Schwier explicitly testified that there was not a reasonable probability of recovery. (*Id.* at 1265:17-24 ("What I said earlier is when you run -- when you look at it in the Monte Carlo analysis, that was only a 2 out of 10 shot, so I wouldn't call that a – what's the term you used? -- reasonable probability. I wouldn't use that term.").) And the thirty-first exhibit to the Giunta Declaration does not contain the language it is cited for in Petitioner's Memorandum of Law, (Pet. Mem. 19), namely that "if anything should happen to go sideways at trial, it would likely be a massive verdict." (*But see* Doc. 17-31.)[7]

In any event, the Panel weighed the parties' conflicting accounts regarding the likelihood of a large verdict on the Hogan claim and came to the conclusion that Hudson's account was more credible than MRMA's, and that therefore, there was a "possibility" rather than a

---

[7] I find no merit in Petitioner's tortured argument that paragraph seventeen of the Award "concedes" that there was a reasonable probability of recovery because it states that "[i]t should also be noted that Hogan never made a demand within limits, in the face of which, regardless of Hudson's stance, MRMA would have been compelled to consummate the settlement to avoid an excess verdict." (Award 8–9.) Petitioner argues that this means that, because the preconditions for the duty to settle to apply are (1) a reasonable probability of recovery; and (2) a demand within limits, that the Panel admitted that there was a reasonable probability of recovery, because only upon that precondition would a demand within limits invoke the duty to settle. Of course, this argument flies in the face of the rest of the Award, which is littered with assertions that the settlement was driven by a "subjective and untethered fear of a nuclear verdict" and that "there was no compelling reason, other than the half-baked paranoia of the SPD, for settlement to be effected when it was." (Award 6, 9.) The Panel in this sentence outlined what was not, not what was: In the absence of any express admission from the Panel that there was a reasonable probability of recovery, I decline to essentially create such an admission out of whole cloth.

21

"probability" of excess recovery.  The evidence is consistent with this determination.  (*See* Doc. 17-14 ("Hudson Specialty appreciates the possibility that a jury could reach a verdict many multiples of the policy limit"); Doc. 17-15 ("[A] verdict well in excess of the policy limits is certainly possible.").)  Therefore, the Panel concluded MRMA was under no obligation to settle. *See Powell v. Am. Serv. Ins. Co.*, 7 N.E.3d 11, 19 (Ill. App. Ct. 2014) ("The reasonable probability standard . . . requires pleading facts that demonstrate liability is probable, as opposed to merely possible."); *see also Swedish-American Hosp. Ass'n of Rockford v. Illinois State Med. Inter-Ins. Exch.*, 916 N.E.2d 80, 101 (Ill. App. Ct. 2009) (where record contains "conflicting testimony and documents," and "the range of potential jury awards in the record was wide," no reasonable probability of excess judgment).

Rather than making an actual argument that the Panel "willfully flouted the governing law" on the duty to settle, "by refusing to apply it," *Seneca Nation*, 988 F.3d at 626 (internal quotation marks omitted), Petitioner presents a litany of grievances with the way that the Panel weighed the facts and interpreted the Reinsurance Contract, which are beyond the scope of manifest error review, *See Andriesz v. BGC Fin., L.P.*, No. 24-CV-7004, 2025 WL 1184097, at *7 (S.D.N.Y. Apr. 23, 2025), *appeal dismissed* (Aug. 1, 2025) (explaining that "the Court's role is not to reassess the evidentiary record" in reviewing an arbitral award for manifest disregard of the law); *Nat'l Football League Mgmt. Council v. Nat'l Football League Players Ass'n*, 820 F.3d 527, 536 (2d Cir. 2016) ("It is the arbitrator's construction of the contract and assessment of the facts that are dispositive, 'however good, bad, or ugly.'" (quoting *Oxford Health Plans*, 569 U.S. at 573)); *T. Co. Metals, LLC*, 592 F.3d at 339 ("With respect to contract interpretation, [the manifest disregard] standard essentially bars review of whether an arbitrator misconstrued a

contract."). Therefore, the Panel did not manifestly disregard the law regarding Petitioner's duty to settle.

### 4. The Panel's Failure to Make an Explicit Finding that the Settlement Was Unreasonable or Regarding Estoppel Does Not Mean it Manifestly Disregarded the Law

Petitioner next complains of the Panel's failure to, in its interim award, make explicit findings that Petitioner's estoppel argument failed or that the settlement was unreasonable, claiming that such an omission amounted to the Panel disregarding the law. (Pet. Mem. 23–26.) However, the eleven-page interim award that thoroughly laid out the Panel's reasoning in reaching its decision went well beyond what is necessary for an arbitral award to be confirmed. It is black letter law that "[a] reasoned award sets forth the basic reasoning of the arbitral panel on the central issue or issues raised before it. It need not delve into every argument made by the parties." *Leeward Constr. Co., Ltd.*, 826 F.3d at 640. That the award did not explicitly state that Petitioner's estoppel argument failed is no flaw when it did explicitly conclude that Hudson did not "in any way acquiesce[] to the Hogan settlement" and that it did not do "anything outside of the customarily accepted behavioral norms of a similarly situated reinsurer," (Award 8), and any claim of estoppel would necessarily be predicated on a contrary finding. (Opp'n 25–26.) Such an award "easily clears the hurdle for a reasoned award. [Petitioner's] arguments that the final [] award falls short because it does not directly address all its arguments or overlooks certain testimony would require far more searching review than the FAA permits." *Smarter Tools Inc. v. Chongqing Senci Imp. & Exp. Trade Co.*, No. 18-CV-2714, 2021 WL 766258, at *2 (S.D.N.Y. Feb. 26, 2021), *aff'd*, 57 F.4th 372 (2d Cir. 2023). Other courts in this District have held that "a 10-page written decision, reflecting a detailed legal analysis does not 'simply reflect the [Panel]'s own notions of justice,'" and should be confirmed. *Tecnotubi S.P.A. v. Tex-Isle*

*Supply, Inc.*, No. 23-CV-7263, 2025 WL 2197148, at *6 (S.D.N.Y. Aug. 1, 2025) (cleaned up) (quoting *E. Associated Coal Corp. v. United Mine Workers of Am., Dist. 17*, 531 U.S. 57, 62 (2000)).  The same analysis applies to the eleven-page written decision containing legal reasoning like that before me here.

Similarly, Petitioner's attempt to fault the Panel for not providing "analysis in the Award regarding whether the Hogan settlement, or any portion of it, was reasonable," fails.  (Pet. Mem. 25 (cleaned up).)  First, as I explained above, the Panel did not "acknowledg[e] that there was a reasonable probability of liability and a reasonable probability of excess judgment."  (*See supra* at 21 n.7; *but see* Pet. Mem. 25.)  Second, the fact that the Award did not explicitly say that the settlement was unreasonable and instead stated that "there was no compelling reason, other than the half-baked paranoia of the SPD, for settlement to be effected when it was," (Award 9), that "for all the wrong reasons a settlement trial balloon became the be-all and end-all for the SPD who, through its undue influence on MRMA's decision making objectivity, prejudiced and corrupted the Hudson/MRMA reinsurance relationship by directing a policy limits settlement," (*id.*), and that "what really drove the Hogan settlement was the SPD's subjective and untethered fear of a nuclear verdict," (*id.* at 6), seems tantamount to stating that the settlement was unreasonable and failure to explicitly use the word "reasonable" cannot be grounds for invoking the "doctrine of last resort" that is vacatur of an arbitral award for manifest disregard of the law. Therefore, I do not find that the Award's failure to expressly incorporate a finding on the reasonableness of the settlement warrants vacatur.

**5.    The Panel Did Not Fail to Provide the Parties With an Adequate Opportunity to Present Evidence**

Petitioner also argues that the Panel refused to hear expert testimony relating to the dispute and that this warrants vacatur.  (Pet. Mem. 28–29.)  However, Respondent alleges that the Arbitrators did not refuse to admit expert testimony, (*see* Opp'n 31), and instead merely noted that the inclusion of expert testimony might require a reduction in the number of fact witnesses to conserve resources.  Respondent is correct.

On August 2, 2022, Umpire Thirkill emailed the parties explaining that the panel "question[ed] the need for an expert to try and prove that the underlying settlement was reasonable," but noting that "if any experts are allowed the number of fact witnesses may need to reduce."  (Doc. 17-36.)  The panel did not refuse to permit expert testimony.  However, Petitioner appears to have taken no further action to seek admission of any particular expert witness, and there is no evidence in the record that the Panel prevented Petitioner "from presenting pertinent and material evidence" in advance of the issuance of the Award, and if Petitioner "did not avail itself of the opportunity to be heard by proffering further evidence," then "[c]ourts have held that a party is not denied a fundamentally fair hearing."  *Oracle Corp. v. Wilson*, 276 F. Supp. 3d 22, 30–31 (S.D.N.Y. 2017) (collecting cases).

Regardless, the scope of my review of a panel's decision to admit or exclude evidence is extremely narrow.  *See Flextronics Int'l, Ltd. v. Allianz Glob. Corp. & Specialty SE*, 809 F. Supp. 3d 170, 185 (S.D.N.Y. 2025) ("So long as a 'barely colorable' justification exists for a panel's decision to exclude evidence, a court cannot overturn an award." (quoting *Rai v. Barclays Cap. Inc.*, 739 F. Supp. 2d 364, 375 (S.D.N.Y. 2010), *aff'd*, 456 F. App'x 8 (2d Cir. 2011) (summary order))), *judgment entered*, 2025 WL 3688681 (S.D.N.Y. Dec. 19, 2025).  "An Arbitrator must give each party 'an adequate opportunity to present its evidence and argument,'

25

but it is 'not required to hear all the evidence proffered by a party.'" *Jiangxo Zhengao Recycled Textile Co. v. Amazon.com Servs. LLC*, No. 24-CV-3434, 2025 WL 834724, at *4 (S.D.N.Y. Mar. 14, 2025) (quoting *Kolel Beth Yechiel Mechil of Tartikov*, 729 F.3d at 107). Arbitrators have wide latitude in deciding whether to exclude evidence. *LJL 33rd St. Assocs., LLC v. Pitcairn Props. Inc.*, 725 F.3d 184, 195 (2d Cir. 2013) ("Arbitrators have substantial discretion to admit or exclude evidence.").

Pitcairn is instructive – in that case, the Second Circuit overturned a District Court ruling which had vacated an arbitral award on the basis that the arbitrator had "excluded four pieces of hearsay evidence" that the petitioner claimed had "prevented [it] from effectively demonstrating the agreement of four experts that" the piece of property which the parties had engaged in arbitration about "was worth substantially more than [Respondent's] valuation." 725 F.3d at 193 (internal quotation marks omitted). In reversing the district court, the Second Circuit found there that the explicit exclusion of such valuation evidence was not "an instance of [] fundamental unfairness." *Id.* at 194. So even if the Panel had refused to hear expert testimony on the valuation of the settlement (and Petitioner has not demonstrated that it did), such an exclusion would not be so fundamentally unfair as a matter of law such that it would warrant vacatur of the Award. Therefore, Petitioner's argument as to this point fails.

### B. *The Panel Did Not Exceed its Powers or Manifestly Disregard the Law Regarding Remedies*

Next, Petitioner again asks me to second guess the carefully considered and detailed remedy crafted by the Panel and fashion an alternative remedy because the remedy awarded by the Panel, which included attorneys' fees, purportedly runs contrary to Illinois law. (Pet. Mem. 26–28.) This argument fails because the Second Circuit has long held that "a choice of law provision will not be construed to impose substantive restrictions on the parties' rights under the

26

Federal Arbitration Act, including the right to arbitrate claims for attorneys' fees." *PaineWebber Inc. v. Bybyk*, 81 F.3d 1193, 1202 (2d Cir. 1996). In other words, a party's "substantive right under the Federal Arbitration Act to enforce the arbitration provision" in a contract is "unaffected" by a choice of law clause elsewhere in the agreement that chooses a law that does not permit the award of attorneys' fees in arbitration. *Id.* at 1197; *see also LiveWire Ergogenics, Inc. v. JS Barkats PLLC*, 645 F. Supp. 3d 290, 300 (S.D.N.Y. 2022) (collecting cases); *Nat'l Union Fire Ins. Co. of Pittsburgh, PA. v. Odyssey Am. Reinsurance Corp.*, No. 05-CV-7539, 2009 WL 4059183, at *7 (S.D.N.Y. Nov. 18, 2009) ("[T]he ability of an arbitrator to award attorneys' fees is similarly not a matter of substantive law which would be subject to the choice of law provision.").

Petitioner also argues that under Illinois law I should modify the Award, reducing it to the difference between the settlement and the $2.285 to $4 million to which Hudson purportedly agreed. (Pet. Mem. 26–28.) However, this argument fares no better than the claim regarding attorneys' fees. The Arbitration Clause between the parties contained no express requirement that the remedies be governed by Illinois law. (*See* Doc. 17-3.) Petitioner may not merely rely on a choice of law provision to "impose substantive restrictions on the parties' rights under the Federal Arbitration Act, including the right to arbitrate claims for" specific kinds of damages. *Bybuk*, 81 F 3d. at 1202. Instead, the Reinsurance Agreement provides that: "The arbitrators shall adopt their own rules and procedures and are relieved from judicial formalities. In addition to considering the rules of law and the customs and practices of the insurance and reinsurance business, the arbitrators shall make their award with a view to effect the intent of the agreement." (Doc. 17-3 Art. XXI.) As the Second Circuit explained: "[w]here an arbitration clause is broad, arbitrators have the discretion to order such remedies as they deem appropriate." *ReliaStar Life*

27

*Ins. Co. of N.Y. v. EMC Nat. Life Co.*, 564 F.3d 81, 86 (2d Cir. 2009). "[A]rbitration provisions that specify that 'any disputes' shall be determined by arbitration," such as the one in the Reinsurance Agreement, "are typically deemed to be 'broad' arbitration provisions." *In re Arb. Between Gen. Sec. Nat. Ins. Co. & AequiCap Program Adm'rs*, 785 F. Supp. 2d 411, 418 (S.D.N.Y. 2011) (citing *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 59–61 & n. 7 (1995)).

For such "broad" arbitration clauses, "courts have consistently refused to vacate a wide range of damages awarded by arbitrators," provided that nothing in the arbitration agreement "expressly precluded the type of damages that the arbitrators ordered." *Caremark, L.L.C. v. N.Y. Cancer & Blood Specialists*, 740 F. Supp. 3d 340, 353–54 (S.D.N.Y. 2024). Here, the arbitration clause in the Reinsurance Agreement contains no such express preclusion of "the type of equitable damages the Panel awarded," *see id.* at 354, but rather only provides that "[t]he panel is empowered to grant interim relief as it may deem appropriate" only prohibiting "punitive damages," (Doc. 17-3 at 15–16). Because the Award does not provide for any damages expressly precluded by the parties' agreement, the damages award is "defensible," which is "all that § 10(a)(4) requires." *One World Filter Corp. v. Koslow Techs. Corp.*, No. 21-CV-10769, 2025 WL 2720963, at *12 (S.D.N.Y. Sept. 24, 2025). Therefore, I deny Petitioner's motion to modify the Panel's damages award.

### C. *There Was No Evident Partiality*

Petitioner's final argument, which is that the arbitrators displayed evident partiality, also fails. (*See* Pet. Mem. 30–33.) Petitioner's conclusory allegations that arbitrators fell asleep during testimony or were using their phones, (*see id.* at 30–31), do not come close to meeting the standard for showing evident partiality sufficient to vacate an arbitration award in the Circuit.

28

"Unlike a judge, who can be disqualified in any proceeding in which his impartiality *might* reasonably be questioned, an arbitrator is disqualified only when a reasonable person, considering all of the circumstances, would *have* to conclude that an arbitrator was partial to one side." *Applied Indus. Materials Corp. v. Ovalar Makine Ticarei Ve Sanayi, A. S.*, 492 F.3d 132, 137 (2d Cir. 2007) (emphasis in original) (internal quotation marks omitted). Typically, challenges to the impartiality of an arbitrator sound in conflicts of interest between the arbitrators and their role presiding over the dispute. *See, e.g.*, *Scandinavian Reinsurance Co.*, 668 F.3d at 74 (finding that the fact that failure to disclose that two arbitrators served together on a different arbitration was not "indicative of bias in these proceedings" and so did not require vacatur); *Merck & Co. v. Pericor Therapeutics, Inc.*, No. 16-CV-22, 2016 WL 4491441, at *8 (S.D.N.Y. Aug. 24, 2016) (denying motion to vacate arbitration based on "professional dealings" and other "connections" to "individuals working for" two of the parties to the arbitration). No such conflict is alleged here.

An argument of evident partiality fails when a petitioner cannot "identif[y] [a] direct connection" between the alleged conflict and the "outcome of the arbitration." *Id.* at *9. Here, Petitioner identifies no "direct connection," arguing, effectively, that the Panel was biased because it ruled in Hudson's favor. (*See* Pet. Mem. 30 ("The Award misstates or mischaracterizes essentially all of the facts in order to support a finding in favor of Hudson."), *id.* at 31 ("The Panel's conclusion that the SPD Board meeting minutes are somehow 'damning'" evidence of evident partiality), *id.* at 32 ("The Award's assertion that SPD's concerns were illegitimate 'half-baked paranoia'" demonstrates partiality).) However, Petitioner makes no showing of how these findings were connected to any purported failure by the arbitrators to pay enough attention during testimony or how the alleged incidents favored Hudson over MRMA.

Instead, MRMA uses this section of its brief to "relitigate the merits of their dispute," which is plainly not the function of District Court review under the FAA. *Trs. of New York State Nurses Ass'n Pension Plan v. White Oak Glob. Advisors, LLC*, 102 F.4th 572, 609 n.21 (2d Cir. 2024). Therefore, finding no relationship between the conduct of the arbitrators that Petitioner complains of and the adverse outcome to it resulting from the proceeding, I reject Petitioner's argument that the award should be vacated on evident partiality grounds.

### D.   *The Arbitration Award Is Confirmed, but New York Insurance Law § 1213 Does Not Apply*

Because Petitioner's arguments to vacate the Panel's award fail, and because courts should confirm arbitral awards "[a]bsent a statutory basis for modification or vacatur," *Ottley v. Schwartzberg*, 819 F.2d 373, 376 (2d Cir. 1987), I grant Respondent's cross-motion to confirm the final arbitral award. (*See* Resp. Mem. 2–4.) However, Respondent's argument that Petitioner is required to post security pursuant to New York Insurance Law § 1213 fails. (*See id.* at 4–7.)

Section 1213 "subject[s] certain insurers to the jurisdiction of the courts of this state in suits by or on behalf of insureds or beneficiaries under certain insurance contracts." N.Y. Ins. Law § 1213(a). Such insurers must "deposit with the clerk of the court in which the proceeding is pending, cash or securities or file with such clerk a bond with good and sufficient sureties, to be approved by the court, in an amount to be fixed by the court sufficient to secure payment of any final judgment which may be rendered in the proceeding." N.Y. Ins. Law § 1213(c)(1)(A). These "certain insurers" are those that "issue[] or deliver[] in this state," insurance policies to "residents of this state" "while not authorized to do business in this state." N.Y. Ins. Law § 1213(a).

30

MRMA is not such an insurer subject to Section 1213. Although it is certainly true that Section "1213 applies to those engaged in reinsurance transactions," *Brit. Int'l Ins. Co. v. Seguros La Republica, S.A.*, 212 F.3d 138, 140 (2d Cir. 2000), it does not apply to an insurer like MRMA that is not alleged to have "issued or delivered" policies in New York, *see* N.Y. Ins. Law § 1213(a). Indeed, "[t]he four bases of jurisdiction enumerated in section 1213(b) [] all require that the relevant policy be issued or delivered in New York." *Blau v. Allianz Life Ins. Co. of N. Am.*, 124 F. Supp. 3d 161, 175 (E.D.N.Y. 2015). Here, the relevant policy was issued and delivered in Illinois, so Section 1213 has no application. Therefore, Respondent's request for security pursuant to Section 1213(c) fails.

## V.    Conclusion

MRMA's motion to vacate the interim arbitral award is DENIED. Hudson's cross-motion to confirm the final arbitral award is GRANTED.

The Clerk of Court is directed to terminate the outstanding motion at Doc. 24 and enter judgment in favor of Hudson and against MRMA for $1,106,110.68 plus compound interest at the rate of 9% per annum from March 15, 2023, (Doc. 23-1), and reasonable legal fees, (Docs. 17-12; 21-1).

SO ORDERED.

Dated: June 23, 2026
          New York, New York

Vernon S. Broderick
United States District Judge

31